## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **JORDAN JOSEPH KINARD,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:14CV00230 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **GREGORY HOLLOWAY, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Jordan Joseph Kinard, Pro Se Plaintiff; James M. Isaacs, Jr., Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants Holloway and Schilling; Rosalie Pemberton Fessier, Timberlake Smith Thomas & Moses, P.C., Staunton, Virginia, for Defendants Miller and Smith.*

Jordan Joseph Kinard, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Liberally construed, Kinard's Amended Complaint alleges that the defendant prison administrators and medical personnel acted with deliberate indifference to Kinard's serious medical needs related to a painful right shoulder condition, in violation of his rights under the Eighth Amendment. After review of the record, I conclude that the defendants' motions for summary judgment must be granted.

## I.

Kinard arrived at Wallens Ridge State Prison in early October 2013. His claims in this lawsuit arise from undisputed facts concerning the course of medical

treatment he received between that time and August 2014, related to his complaints of shoulder pain.

The Virginia Department of Corrections ("VDOC"), through its Department of Health Services ("DHS"), contracts with licensed doctors to provide comprehensive medical evaluation, care, and treatment to inmates at VDOC prison facilities. The facility warden is to ensure that each inmate has access to a contract physician and to adequate health care services. The facility physician maintains the entire patient medical record, evaluates the patient's complaints, and makes all decisions regarding his health care and treatment. The physician also has discretion to request medical testing or order treatment, based on his knowledge and assessment of the patient. VDOC and facility administrators have no involvement in these medical decisions.

Dr. Daniel Miller was under contract to provide medical care to Wallens Ridge inmates. He examined Kinard for an intake history and physical on October 7, 2013. Kinard states that from the beginning, he told Dr. Miller about the § 1983 action he had filed against medical personnel at Sussex I State Prison, including an orthopedic specialist, for not properly treating his shoulder. *Kinard v. Pearson*, No. 2:12CV00482-AWA-DEM, Slip Op. at 13 (E.D. Va. Aug. 25, 2015) (ECF No. 87) (granting summary judgment for Sussex I defendants). In that case, Kinard alleged that he initially injured his right shoulder on March 2, 2012, when he fell

while trying to descent from a top bunk, and that he reinjured the shoulder in several later falls.[1]  *Id*. at 3.

Kinard informed Dr. Miller that he had a "rotator cuff injury to the right shoulder that needed to be properly diagnosed and treated."  (Am. Compl. ¶ 2, ECF No. 29.)  Dr. Miller noted that a shoulder X ray in Kinard's records from August 16, 2013, showed no evidence of acute fracture or malalignment and indicated that "his AC joint was intact."[2]  (Miller Decl. ¶ 2, ECF No. 72-1.)  Dr. Miller wrote an order for a bottom bunk for 30 days to give time to evaluate the severity and validity of Kinard's shoulder problems.  He also prescribed Tylenol 1000 mg twice a day and discontinued a prior prescription for Mobic, which Kinard said was not managing his pain.

Dr. Miller saw Kinard on October 9, 2013, for complaints about his right shoulder rotator cuff injury.  He found that Kinard had equal strength in his rotator

---

[1]  Doctors at Sussex I first diagnosed Kinard with a possible rotator cuff injury. *Id*. at 3.  The orthopedic specialist refined this diagnosis as rotator cuff tendonitis with bicep tendonitis, for which he recommended Naprasyn or Mobic for pain, rotator cuff exercises, and a steroid injection, which Kinard refused.  *Id*. at 4.  Kinard asked to undergo a magnetic resonance imaging ("MRI"), but the specialist did not recommend this procedure.  *Id*.  In October 2012, Kinard asked for referral back to the specialist for a steroid injection. *Id*. at 5.  His treating physician wrote the referral and also completed paperwork to obtain authorization for an MRI; this request was deferred, pending recommendations from the specialist.  *Id*.  In March 2013, after Sussex I authorities transported Kinard to the specialist's office, Kinard refused examination and the scheduled steroid injection, and the specialist released Kinard from his care.  *Id*.

[2]  According to medical information available online, "[t]he AC joint is where the collarbone (clavicle) meets the highest point of the shoulder blade (acromion)." http://orthoinfo.aaos.org/topic.cfm?topic=a00033 (last read Sept. 19, 2015).

-3-

cuff muscles, although his biceps tendon was tender to palpation. Because weakness is one of the key clinical signs of a rotator cuff tear, Dr. Miller did not believe that Kinard had a rotator cuff tear. He prescribed Naprosyn for pain and ordered a steroid injection for the purpose of reducing inflammation, which would then help to alleviate pain and help increase range of motion in the shoulder.[3] Kinard wanted a sling for his right arm and an MRI, but Dr. Miller did not order them.

Kinard reported to medical on October 18 for the scheduled steroid shot. Dr. Miller explained why he did not believe Kinard had a rotator cuff tear and reviewed the risks and benefits of a steroid injection. After demanding time to review the consent form for the shot, Kinard refused to sign the form or take the injection until he could talk to his lawyer. Dr. Miller discontinued Naprosyn and started Kinard on 650 mg of Tylenol twice a day for 30 days.

A nurse saw Kinard at his cell door on November 20, 2013, on sick call for complaints of right shoulder pain. The nurse noted that Kinard could easily raise his arms above his head when removing his T-shirt. The nurse observed no swelling or sign of discomfort or injury and noted that Kinard was rotating both shoulders equally with no sign of difficulty, while talking about his lawsuit.

---

[3] In so doing, according to Kinard, Dr. Miller was deferring to a report in Kinard's records from the orthopedic specialist, who had previously prescribed a steroid injunction for Kinard's shoulder condition.

Another nurse saw Kinard on November 25. He refused his prescribed medication, saying that it was not helping his shoulder pain. The nurse noted that he was in no acute distress and had good range of motion in his right shoulder.

That same day, Dr. Miller examined Kinard's right shoulder and noted a decreased range of motion and some tenderness. Dr. Miller again discussed with Kinard the benefits of a steroid injection. He noted that Kinard seemed more interested in talking about his lawsuit than listening to medical advice, but finally agreed to the steroid shot. Dr. Miller ordered the shot and also ordered Salsalate for pain.

At an exam on December 4, 2013, Kinard reported to Dr. Miller that he had vomited up his Salsalate medication the day before and did not want to take it anymore. The doctor observed that Kinard did not appear to be in any pain when moving his arms, as he was not wincing or exhibiting facial expressions indicating pain. The doctor started to explain that he had not been on Salsalate very long, and was on the list for a steroid shot. Kinard interrupted this consultation to tell Dr. Miller that he had mailed the doctor a certified letter from his attorney about his neck and shoulder.[4] Dr. Miller discontinued Salsalate and started Kinard back on Naprosyn.

---

[4] Kinard states that this letter explained how his right to adequate medical care required "a more graphical reading of his shoulder." (Am. Compl. ¶ 9, ECF No. 29.)

After a shoulder exam on December 13, at Kinard's request, Dr. Miller discontinued Naprosyn and ordered Mobic. The doctor also discussed the possible benefit a steroid shot offered for pain and encouraged Kinard to stretch and work on range of motion with his shoulder. On December 20, 2013, Dr. Miller reviewed Kinard's chart and noted that he had refused several doses of Mobic in the last week. Based on this noncompliance with the prescribed medication plan, Dr. Miller discontinued Mobic.

At some point, Kinard asked to have his right shoulder x-rayed again before taking the prescribed steroid shot. So Dr. Miller ordered an X ray, which was performed on January 24, 2014. This X ray "showed no gross acute displaced fractures; slight elevation of the distal end of the right clavicle with respect to the acromion which could be secondary to a slight AC separation; and mild soft tissue swelling at the AC joint."[5] (Miller Decl. ¶ 14, ECF No. 72-1.)

Dr. Miller saw Kinard on February 5, 2014, for right shoulder pain. Kinard was very tender to palpation in the AC joint area and had a positive cross arm test

---

[5] Kinard states that a Dr. Edward Barczak issued this interpretation of the X ray performed on January 24, 2014. Kinard named Dr. Barczak as a defendant in the Amended Complaint, but the clerk's office was unable to accomplish service on him. Kinard failed to comply with an order to provide additional information or an address for this defendant for purposes of service of process. Therefore, I will dismiss all claims against this defendant, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. I also note that Kinard's allegations that Dr. Barczak misrepresented the results of this X ray state, at most, a possible claim of professional negligence, which is not actionable under § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner").

indicating arthritis in the AC joint. Dr. Miller's impression that day, based on Kinard's clinical presentation and the January 2014 X ray was AC joint arthropathy vs. mild separation.[6] The doctor ordered Mobic for pain and inflammation and recommended and renewed the order for the steroid injection, which was scheduled for February 10.

When Kinard reported to medical for the steroid injection, however, he told Dr. Miller that his attorney, after speaking with an outside orthopedic surgeon, had told him to refuse the injection. Kinard also told the doctor that he was getting some pain relief from the Mobic. Dr. Miller explained to Kinard that he had clinical and radiographic evidence suggesting the shoulder problems stemmed from "AC joint pathology." (Miller Decl. ¶ 16, ECF No. 72-1.) Based on these factors, the doctor's medical opinion was that Kinard's best option for relief of his pain, inflammation, and mobility issues was the steroid injection. Kinard refused the injection and said that after two years of pain and loss of mobility in the shoulder, the problem should be "rectified via surgery." (Pl. Counter Affid. ¶ 9, ECF No. 82.)

Kinard returned to medical on February 19 with AC joint pain. He told Dr. Miller that Mobic was not sufficiently addressing his pain, which was worse at

---

[6] Kinard alleges that Dr. Miller's diagnosis on February 5 was "a separated shoulder joint, possibly torn or stretched ligaments" in that area. (Am. Compl. ¶ 12, ECF No. 29.)

night and early in the morning. Noting nothing remarkable on exam, Dr. Miller doubled the evening dose of Mobic and urged Kinard to take the medication regularly and to apply for "self-med status so he could take meds before bed when pain was the worst." (Miller Decl. ¶ 17, ECF No. 72-1.) At a March 19 exam, Kinard told Dr. Miller that the pain relief from Mobic wore off within a couple hours, so the doctor ordered Tylenol 1000 mg twice a day. At the February and March exams, the doctor discussed AC joint pathology and treatment options again, repeating his recommendation of the steroid injection. Kinard showed no interest.

On April 16, 2014, Kinard told Dr. Miller that he wanted the steroid injection. Grossly, the doctor observed minimal difference in the right versus left AC joint structures. Dr. Miller administered the steroid injection on April 21, 2014, which Kinard received without complication.

After the injection, Kinard "became ill experiencing cold sweats, migrain[e]s, stiff neck, sore body and intensified pain in the shoulder," as well as vomiting. (Am. Compl. ¶ 15, ECF No. 29.) On April 22, medical staff moved him to the infirmary for observation.

Dr. Miller saw Kinard there on April 23. He reported vomiting the previous day and right-sided chest and neck pain and stiffness, which was feeling better by the day of the exam. Dr. Miller found no erythema, swelling, warmth, or excessive

tenderness of the joint or the injection site and no sign of infection. Kinard was concerned that he might have meningitis or some other neurological disorder, but Dr. Miller saw no signs or symptoms of such a condition and discharged him from the infirmary.

Kinard was seen again by Dr. Miller on May 5, after he complained of burning on and off in the AC joint for three days after the injection. At the exam, he also complained of shoulder pain and decreased range of motion. Upon examination, Kinard lifted his right arm above his head in a fast and fluid motion with no sign of pain from the movement. He lacked only 10 degrees of range of motion. He told the doctor that the combination of Motrin and Tylenol had previously helped to control the pain. Dr. Miller prescribed these medications instead of Mobic.

Happy Smith, M.D., covered for the physicians at Wallens Ridge when they were out. Dr. Smith saw Kinard on May 30, 2014, for complaints of shoulder pain. The doctor noted the recent X ray of Kinard's shoulder showing "possible minimal AC separation," while an earlier X ray had been negative, but Kinard did not report any intervening trauma. (Smith Decl. ¶ 3. ECF No. 72-2.) Dr. Smith also noted reports that Kinard had periodically refused medications and injections. Kinard's pain that day was in his superior scapular trapezius and right cervical spine area, rather than to his shoulder joint. Dr. Smith's assessment was shoulder pain with

functional range of motion and no muscle loss. Kinard requested an MRI. Instead, Dr. Smith ordered a right shoulder X ray with weight bearing, a cervical spine X ray, and Prednisone.[7]

The X rays ordered by Dr. Smith were performed on June 17, 2014. The shoulder X ray showed "that there were no gross acute displaced fractures, that the joint spaces were patent, and that there were no changes" compared to the January 24 X ray. (Miller Decl. ¶ 25, ECF No. 72-1.) Dr. Miller discussed with Kinard the results of the c-spine and shoulder X rays during an appointment on June 30, 2014, for another medical issue.

Dr. Miller next saw Kinard on July 9, 2014, related to complaints about his testicles. The doctor noted that Kinard's hands were cuffed behind his back with no apparent discomfort. Dr. Miller and Dr. Smith, who also happened to be present that day, noted during the examination that Kinard showed very functional range of motion and use of his right shoulder and arm. Dr. Miller states: "I suspected at that time, that [Kinard] was only looking for a lawsuit with his complaints and that he had little to no actual shoulder injury." (*Id*. at ¶ 27.) He

---

[7] Kinard later tried to relay information to Dr. Smith to justify an MRI by explaining the differences between the prior two X rays, including different technician techniques and an intervening injury to the right shoulder. Dr. Smith states that as a covering physician, he did not receive or review this additional information, and it would not have changed his decision to order a third X ray. He states that an X ray is adequate for identifying a possible shoulder separation, and he saw no medical necessity on May 30 for an MRI of Kinard's shoulder.

Case 7:14-cv-00230-JPJ-RSB   Document 88   Filed 09/24/15   Page 10 of 23   Pageid#: 751

noted that no further work up for Kinard's shoulder pain was indicated and discussed that finding with Kinard.

On July 30, 2014, Kinard was on Dr. Miller's appointment list with complaints of knee and shoulder pain. Kinard refused to be examined and would not sign the refusal form.

Dr. Miller saw Kinard again on August 6, 2014, for complaints of right-sided neck pain and right shoulder pain upon external rotation. On exam of the shoulder, the doctor found no indication of tenderness to palpation and noted nearly full strength. Dr. Miller's diagnosed mild muscle spasms in the neck and mild shoulder pain, found no indication for an orthopedic consult, and ordered Tylenol and Motrin.

Liberally construed, Kinard's claims in the Amended Complaint are: (1) Dr. Miller and Dr. Smith were deliberately indifferent to Kinard's serious medical need for different diagnostic testing or referral to an orthopedic specialist and his need for different pain management, related to his right shoulder pain; (2) During examinations for unrelated medical issues in June and July 2014, Dr. Miller retaliated against Kinard by refusing to talk about his shoulder complaints which are the subject of this lawsuit; (3) Warden Gregory Holloway and DHS Director Fred Schilling knew from Kinard's grievances and appeals that Dr. Miller was not providing adequate care for Kinard's shoulder condition, but they failed to

intervene; (4) DHS has a "practice of discouraging medical staff from referring prisoners to outside medical practitioners and from providing expensive medical tests and procedures," which deprived Kinard of such services and constituted deliberate indifference to his serious medical needs (Am. Compl. ¶ 46, ECF No. 29.); and (5) the defendant doctors conspired to deny Kinard prompt, adequate treatment of his shoulder condition and the other defendants "tacitly authorized" the doctors' actions.[8] As relief, Kinard seeks monetary damages and injunctive relief, directing the defendants to provide "orthopedic consultation, further diagnostic testing" to rule out possible bone cancer in his shoulder, "adequate pain management and a bottom bunk assignment." (Am. Compl. ¶ 72, ECF No. 29.)

---

[8] Kinard contends that he raised an additional claim alleging that Dr. Miller was deliberately indifferent to his neck pain. The Amended Complaint mentions this condition only as an instance when the alleged DHS practice described in Claim (4) supposedly deprived Kinard of appropriate medical care. Therefore, the defendants did not address this issue as a deliberate indifference claim, and I do not consider it as such.

In any event, Kinard's allegations on the neck pain issue do not support a § 1983 claim. In Dr. Barczak's written report of the June 2014 cervical spine X ray results, he noted "a deviation of the upper cervical spine toward the left" which could be "scoliosis" and stated the conditional recommendation that "[i]f *clinically suspect* that a fracture is present but not seen at this time, or if patient's symptoms continue or worsen, then would recommend CT scan for further evaluation, *as clinically indicated*." (Am. Compl. ¶ 55, ECF No. 29.) Kinard alleges that Dr. Miller, in his medical chart, misleadingly characterized these X ray results as "normal" and showing "no gross acute fractures" without mentioning the possible scoliosis or "hairline fractures" possibly present. (*Id.* ¶ 53-54.) The X ray report itself is part of Kinard's medical record, however, and Kinard does not state facts showing that Dr. Miller's notes about the report deprived him of necessary medical treatment in any respect.

Dr. Smith and Dr. Miller have filed a Motion for Summary Judgment, and by separate counsel, Defendants Holloway and Schilling have filed a Motion for Summary Judgment. Kinard has responded to both motions, and I find them ripe for disposition.[9]

## II.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment. To prevail on a claim of constitutionally inadequate medical care, a prisoner plaintiff must establish acts or omissions harmful enough to constitute deliberate indifference to serious medical needs. *Estelle*, 429 U.S. at 106.

First, the prisoner must objectively show that the deprivation suffered or the injury inflicted was, "objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). A serious medical need "is one that has

---

[9] Kinard has asked for discovery to obtain copies of VDOC and DHS policies and contracts, among other things, in support of his claims against Holloway and Schilling. Earlier in the case, the court stayed discovery, pending a ruling on the defendants' qualified immunity defense. I conclude, however, that all of Kinard's claims can be resolved based on the undisputed facts already in the record concerning the medical care provided to him at Wallens Ridge. Therefore, I find that Kinard's inability to obtain the requested discovery does not preclude addressing the defendants' dispositive motions on the merits.

-13-

been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (citation omitted).

Kinard repeatedly states that the nature of his shoulder injury, as reflected in his X rays, range of motion issues, and reports of pain, was so obvious that any lay person would have recognized that the condition was serious and mandated advanced testing, a specialist, and even surgery. Kinard presents no evidence, however, that any doctor treating his complaints of shoulder pain, including an orthopedic specialist, has declared that an MRI is a medical necessity to determine appropriate care for the condition or that surgery is warranted. Moreover, Kinard's own allegations belie the alleged obviousness of his medical needs. His layman's characterization of his condition has changed during the course of this case from a rotator cuff tear, to an unspecified orthopedic problem, to a separated shoulder, to torn or stretched ligaments and nerve damage, to a possible hairline fracture, and now to the possibility of bone cancer. In addition, his repeated failures to take prescribed medications regularly and his rejection of other offered treatment for pain, such as the steroid injection recommended by an orthopedic specialist, undermine the validity of his subjective descriptions of severe shoulder pain.

Even if I were to assume that Kinard's shoulder issues presented a serious medical need for treatment at Wallens Ridge, to prevail on his § 1983 claim, he

must also show the defendants' deliberate indifference to his serious medical need. He must state facts indicating that each defendant knew of and disregarded an excessive risk to his health or safety. *See Farmer*, 511 U.S. at 837. The defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The defendant is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," *id.* at 844, or if he responded reasonably to that risk. *Id.*

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (*overruled on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994)). "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference. *Estelle*, 429 U.S. at 105. Similarly, the "deliberate indifference standard is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment.'" *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished) (quoting *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985) (same). Doctors may not be liable under § 1983 for negligent diagnosis or treatment. *Johnson v.*

*Quinones*, 145 F.3d 164, 168-69 (4th Cir. 1998) (granting summary judgment where doctor provided diagnosis and treatment, but did not diagnose or treat pituitary gland tumor that ultimately blinded the prisoner plaintiff).

Kinard seeks to build his case against Dr. Miller and Dr. Smith, using stock phrases and labels, pulled from these constitutional standards. He asserts that the doctors "failed to respond reasonably to [his] medical condition," "ignored" or failed to diagnose or provide treatment for "obvious conditions of orthopedic nature," "failed to investigate enough to make an informed judgment," "delayed treatment . . . of diagnosed conditions," "interfered with access to treatment," "made medical decisions based on nonmedical factors and . . . made medical judgments so bad they were not medical," and "knew [he] had injuries to his shoulder but declined to investigate further via more graphical reading." (Amend. Compl. ¶¶ 24, 27-28.)

While a court must liberally construe a pro se litigant's pleading, such a complaint must present more "than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Moreover, I may grant summary judgment for the defendants if they "show[ ] that there is no *genuine* dispute as to any *material fact* and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). To survive the defendants' motions and supporting affidavits and documentation, Kinard must present specific *facts* from which a jury could reasonably find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). I must draw all reasonable inferences from the *facts* in favor of Kinard, as the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). However, he cannot defeat the defendants' properly supported summary judgment motions with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

The undisputed medical records do not offer factual matter in support of Kinard's conclusory assertions faulting the reasonableness of Dr. Miller's course of treatment. These records show that on multiple occasions, Dr. Miller examined, evaluated, diagnosed, and treated Kinard's shoulder issues as his condition evolved from month to month. Dr. Miller did not merely accept Kinard's self-diagnoses or his reports that certain medications had not worked for him in the past. Rather, the

evidence shows that Dr. Miller formulated and adjusted his treatment plan according to his medical judgment, based on Kinard's complaints, X rays and medical records, as well as recent observations of Kinard's clinical presentation at exams and in his daily functioning. Dr. Miller listened to Kinard's complaints about particular medications and changed the prescriptions or adjusted dosages, and discussed and offered other treatment advice, such as taking his medication regularly and for more than a few days, doing stretching and movement exercises, and taking a steroid injection. His treatment plans were often frustrated by Kinard's impatience, noncompliance, and inexplicable insistence that he knew better than his doctor the appropriate medical diagnoses and treatments for his conditions.

On this record, Kinard has not established any material, disputed fact on which he could show that Dr. Miller acted with deliberate indifference. I find no evidence of medical decisions so grossly incompetent or inadequate as to "shock the conscience." *Miltier*, 896 F.2d at 851. Dr. Miller's decision to plan Kinard's treatment based on his review of Kinard's X rays and symptoms, without ordering additional imaging or seeking an outside specialist's recommendations, was a question of medical judgment that is not subject to judicial review in a § 1983 action. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). On summary judgment, Kinard's bare speculation, without supporting medical evidence, of a

-18-

need for different or additional treatment is not sufficient to establish deliberate indifference.[10]  *See*, *e.g.*, *Jones v. Pittsylvania County Jail*, No. 7:05CV00266, 2005 WL 1035406, at *3 (W.D. Va. 2005) (finding inmate's failure to provide evidence, beyond his own assertions that his laceration required sutures or that any other treatment was necessary, defeated deliberate indifference claim).

Kinard also provides no disputed factual matter supporting his deliberate indifference claim against Dr. Smith.  This defendant was only filling in for other doctors, examined Kinard on one occasion, and ordered an X ray, instead of the

---

[10]  Kinard also asserts a retaliation claim against Dr. Miller related to medical care. Prison officials may not retaliate against an inmate for exercising his constitutional right to access the court.  *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978).  On the other hand, to state a § 1983 claim here, Kinard must present more than conclusory allegations of retaliation.  *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).  He must allege facts showing that his exercise of his constitutional right was a substantial factor motivating the retaliatory action.  *See, e.g., Wagner v. Wheeler*, 13 F.3d 86, 90-91 (4th Cir. 1993) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action") (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Kinard states that after he provided Dr. Miller with a copy of the § 1983 complaint in this case in May 2014, Dr. Miller refused, because of this lawsuit, to discuss or treat his shoulder pain during exams for other medical issues in June and July.  The record indicates, however, other reasons that Dr. Miller did not provide new treatment for Kinard's shoulder issues during this time.  At Kinard's June 30 exam, Dr. Miller told him that the June 17 cervical and shoulder X rays showed no fractures or changes.  At the July 9 exam for Kinard's complaint about his testicles, Dr. Miller and Dr. Smith both observed that Kinard was moving his arm and shoulder without difficulty, on which basis Dr. Miller found that he did not need treatment for that condition.  Dr. Miller failed to treat Kinard for a complaint of shoulder pain on July 30 only because Kinard refused to see him; and Dr. Miller did evaluate Kinard for shoulder pain on August 6 and provided medication for mild neck spasms and shoulder pain.  Kinard presents no disputed fact on which he could persuade a jury that Dr. Miller denied him medical care in retaliation for this lawsuit.

MRI that Kinard wanted.  Dr. Smith observed that two shoulder X rays, one taken a year earlier and one taken six months earlier, showed somewhat contradictory results.  I find no evidence or viable argument that his decision — to order a third X ray of Kinard's current shoulder situation to compare to the earlier films — was an unreasonable response.  Furthermore, Kinard has not shown any detrimental effect he suffered, or is likely to suffer, as a result of Dr. Smith's one-time treatment.

Kinard's personal desire and demand for an MRI or surgery or a specialist referral is not grounds for finding deliberate indifference.  His constitutional right to treatment does not compel prison officials to provide whatever treatment procedure he wants or believes he needs.  *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) (finding "the essential test" for constitutionally required health treatment "is one of medical necessity and not simply that which may be considered merely desirable"); *Hinton v. Md. State Penitentiary*, No. 87-6658, 1987 WL 30252, at *1 (4th Cir. Dec. 17, 1987) (unpublished) (finding that inmate has no Eighth Amendment right to "compel the prison officials to provide him with his self-designed health treatment").  In short, Kinard's medical claims are, essentially, accusations that the doctors' examination and treatment decisions were

negligent, and negligent actions alone are not actionable under § 1983.[11]   *See Estelle*, 429 U.S. at 105-06.

Nonmedical officials evince deliberate indifference by acting intentionally to delay or deny the prisoner access to medical care or by interfering with prescribed treatment.  *Id*. at 104-05.  Such officials "cannot be liable for the medical staff's diagnostic decisions."  *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).  They are entitled to rely on the medical judgment and expertise of the medical professionals charged with providing care to Kinard.  *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (citing *Miltier*, 896 F.2d at 854).  It is not the function of the court, or prison administrators, to second guess the good faith treatment decisions of licensed physicians.  *Id.*; *Russell*, 528 F.2d at 319.

Kinard alleges that Defendant Hollway, as warden, and Defendant Schilling, as DHS director, knew from grievance appeals that Dr. Miller and Dr. Smith were not providing the medical care Kinard believed appropriate for his shoulder pain.[12]  He asserts that by denying his appeals, they merely "rubber stamped" the doctor's deficient treatment decisions.   It is undisputed, however, that Holloway and

---

[11]   Section 1983 was intended to protect only federal rights guaranteed by federal law.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).  Any claim of medical negligence or even malpractice under state law is thus not independently actionable under § 1983, and I decline to exercise supplemental jurisdiction over them in this action.  *See* 28 U.S.C. § 1367(c).  I will dismiss all such claims without prejudice.

[12]   I previously granted Kinard's Motion to Strike his claims against defendant Combs, who is no longer a party to this lawsuit.

Case 7:14-cv-00230-JPJ-RSB   Document 88   Filed 09/24/15   Page 21 of 23   Pageid#: 762

Schilling are not physicians. In response to Kinard's appeals, they investigated whether Kinard was being evaluated and treated by a licensed physician. Other than this administrative oversight, these defendants could rightfully rely on Dr. Miller and Dr. Smith to make medically appropriate diagnostic and treatment decisions.

Moreover, the responses that Holloway and Schilling made or did not make to Kinard's grievance appeals did not implicate any constitutionally protected right. *See Adams*, 40 F.3d at 75 (holding that prisoners do not have a constitutional right to participate in grievance procedures); *Brown v. Va. Dep't Corr.*, No. 6:07-CV-00033, 2009 WL 87459, at *13. (W.D. Va. Jan. 9, 2009). Finally, as I conclude that the doctors' actions did not violate Kinard's constitutional rights regarding his course of medical care, I find no subordinate misconduct for which the administrative defendants could be held liable under § 1983. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (holding that supervisory liability requires showing of an affirmative causal link between supervisor's alleged deliberately indifferent response and plaintiff's alleged constitutional injury).

For this same lack of any constitutionally significant injury, Kinard has no viable claim that DHS policies deprived him of necessary medical care or that the defendants conspired to violate his constitutional rights. In any event, he has no

Case 7:14-cv-00230-JPJ-RSB   Document 88   Filed 09/24/15   Page 22 of 23   Pageid#: 763

actionable claim against DHS, which he has not named as a defendant, and he fails to state facts showing the elements of a conspiracy claim against anyone.[13]

III.

For the reasons stated, I will grant the defendants' Motions for Summary Judgment as to Kinard's § 1983 claims and dismiss any related state law claims without prejudice under 28 U.S.C. § 1367(c).

A separate Order will be entered herewith.

DATED:  September 24, 2015

/s/  James P. Jones
United States District Judge

---

[13]  *See, e.g., Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (finding that state and its agencies are not persons subject to suit for damages under § 1983); *Brown v. Angelone*, 938 F. Supp. 340, 346 (W.D. Va. 1996) (finding that where allegations of conspiracy are merely conclusory, without facts showing common purpose to injure plaintiff, complaint may be summarily dismissed).

-23-